IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

FILED BY __MTF__ D.C.

FEB 23 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

JONATHAN MILLER,

    Plaintiff,

v.

JOYCE EISEN, and
SCOTT MILLER, as Trustee of the Sydney Miller Trust,

    Defendants.

Case No.

Civil Action

23-cv-80290-RLR

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

Plaintiff Jonathan Miller, by way of Complaint against Defendant Joyce Eisen, alleges:

### INTRODUCTION

1. This is an action to invalidate an amendment to the trust agreement of the late Sydney Miller ("Decedent" or "Sydney"). Plaintiff Jonathan Miller is the eldest child of the Decedent and a named beneficiary of the Trust. Defendant Joyce Eisen was the Decedent's girlfriend. As described more fully herein, on or about January 24, 2020, Eisen procured an amendment to Decedent's trust agreement, wresting for herself a $420,000 beneficial interest through fraud, undue influence, emotional abuse and duress, taking advantage of Decedent's complete emotional and physical dependence on her in the final years of his life.

2. At all times relevant herein, Sydney was frail and ill, suffering from numerous ailments including bladder and esophageal cancer and terminal liver failure that required him to undergo dialysis three times per week, unable to walk or drive. Sydney lived in constant fear of Eisen, afraid of her anger and afraid she would follow through on her threats to throw him out of her house.

3. At all times relevant herein, Eisen concealed from Sydney and others that she was wealthy, and fraudulently convinced him that she was "impoverished" and "living on limited income" — as Sydney recounted to his children countless times.

4. Eisen exploited Sydney's weakness and dependence on her, and ultimately brought Sydney to a lawyer of her own choosing and pressured him to sign the amendment — while making no corresponding provision for him in Eisen's own estate planning despite her concealed wealth.

5. Eisen's pattern of exploitation and manipulation continued through the Decedent's very last days, when Sydney, suffering from the final stages of liver failure, esophageal cancer, and numerous other ailments, decided to end treatment and requested to enter home hospice care and die at home. Eisen exploited the situation by pressuring Plaintiff to forgo payment of money owed by Eisen to Plaintiff as a pre-condition for her allowing Sydney to return home to die.

6. As a kind of coda to her years-long pattern of self-centered exploitation of Sydney, Eisen did not trouble herself to attend his funeral.

## PARTIES

7. Plaintiff Jonathan Miller is an individual residing in Mercer County, New Jersey. Jonathan is a named beneficiary of the Trust.

8. Defendant Joyce Eisen is an individual residing in Palm Beach County, Florida. Eisen is the sole beneficiary of the fraudulent and invalid purported Trust amendment referenced herein and the sole perpetrator of the wrongful conduct described in this Complaint.

9. Defendant Scott Miller is the Trustee of the Trust. Scott resides in in Ulster County, New York and is named herein solely in his representative capacity and solely for purposes of compliance and notice.

10. Jonathan, as plaintiff, asserts no claim whatsoever against Scott, as Trustee and nominal defendant.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) because Jonathan is a citizen of New Jersey and Eisen is a citizen of Florida (and Scott, as Trustee, is a citizen of New York), and because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

13. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because Eisen resides in this District.

## FACTS

14. Prior to meeting Eisen, the Decedent had been happily married for forty-two years. He and his wife resided in Nassau County, New York, raised four children together, purchased a vacation home in Sullivan County, New York, led an active, family-centered lifestyle, and were financially comfortable.

15. Sydney, a criminal defense lawyer, was the primary bread-earner in the family until his wife graduated from law school at the age of forty-two, passed the New York State Bar and ultimately became an administrative law judge.

16. Sydney and his wife retired together, sold the family home, and bought an apartment in Broward County, Florida, where they lived in retirement. They became "snowbirds," spending about five months per year at their lakeside vacation home in New York and the remaining months in Florida.

17. Sydney became a widower in 2002, when his wife passed away at home.

18. Upon her passing, Sydney was the sole beneficiary of his wife's estate and acquired sole title in the New York vacation home and the Florida apartment.

19. A year or two later, Sydney met Eisen, a longtime divorcee.

20. At all times relevant herein, Eisen held herself out as living on alimony only, and concealed her substantial wealth.

21. Sydney sold his Florida apartment in 2008 and began living with Eisen in her home.

22. At all times relevant herein, Sydney felt and repeatedly expressed to others that he was a "guest" in Eisen's home, subject to her whims, and could be "thrown out on the street" at any time.

23. The entire course of Sydney's relationship with Eisen was marked by Eisen's unreasonably self-centered, incessant and unyielding demands, as well as constant emotional abuse and belittling.

24. Eisen constantly insulted Sydney's intelligence to his own face as well as in the presence of his children and friends. While there are far too many instances to list, Eisen reacted with rage and scorn over such mundane things as Sydney using the "wrong" spoon to eat with, or buying the "wrong" brand of condiment.

25. Unwilling to countenance even one photo of Sydney's late wife — or even one photo of Sydney's previous life, Eisen forced Sydney to dismantle a wall full of dozens of historical family photos in the family vacation home, relegating them to boxes in the basement, where they were subject to water damage.

26. Similarly, Eisen forced Sydney to remove his late wife's name from a plaque displaying a large fish that they had caught together years before.

27. Eisen continually worked to distance Sydney from his children, refusing to allow them to spend time with Sydney without also including her, constantly interrupting Sydney's conversations with them, and responding with pathological rage when they tried to address these issues with her.

28. Whenever his children tried to discuss Eisen's mistreatment of him, Sydney would respond by reiterating that he could not raise such things with her because he was afraid she would throw him out of the house.

29. Any positive aspects of Eisen's relationship with the Decedent did not negate the constant bullying, verbal assaults, mocking and belittling, nor did they negate Sydney's fear that Eisen would "throw him out on the street" and that he would be left alone and ultimately die in a nursing home.

30. In 2005, Sydney engaged a Florida lawyer and planned his estate.

31. Decedent's Last Will and Testament, executed on October 12, 2005, bequeathed his entire estate to his four children in equal shares, per stirpes, and named Jonathan as his Personal Representative and Scott as Successor Personal Representative.

32. Decedent also created a revocable trust by agreement dated October 12, 2005, naming himself as Trustee, Jonathan as Successor Trustee, and Scott as Jonathan's Successor, and directing that upon his death the Trust assets were to be distributed in equal shares, per stirpes, to his four children.

33. On that same date, Decedent also executed a "Durable Family Power of Attorney" appointing Jonathan as his Attorney-in-Fact and Scott as successor Attorney-in-Fact, with full authority to manage his money and assets if he were declared to be incompetent.

34. On that same date, Decedent also executed a "Durable Medical Power of Attorney" appointing Jonathan as his Attorney-in-Fact and Scott as successor Attorney-in-Fact, with full authority to manage his medical affairs if he was unable to do so.

35. Once Eisen got wind of Sydney's estate planning, she began pressuring Sydney for her "share".

36. At all times relevant herein, Sydney paid the vast majority of his and Eisen's shared expenses, including dining and entertainment expenses, vacation and travel expenses, cellphone expenses, etc., etc.

37. Sydney did so because Eisen had convinced him that she was "impoverished" and unable to pay a fair share of their expenses, and also because he was afraid of crossing Eisen lest she "throw him out of the house" — as Sydney repeatedly conveyed to his children.

38. Sydney was afraid of confronting Eisen because he was afraid of being left alone, afraid of winding up in a nursing home, and did not want to be a "burden" on his children, even though they frequently offered that he could live with them.

39. Nevertheless, so long as Sydney was relatively well in mind and body, he was able to resist some of Eisen's more extreme demands.

40. At one point, Eisen demanded that Sydney bequeath her the New York vacation home — which had been in Sydney's family for decades and which Sydney's children and grandchildren continued to use. Sydney discussed this with his children and did not agree to Eisen's demand.

41. Subsequently, Eisen demanded that Sydney give her a life estate in the New York vacation home, with all expenses to be paid by the Trust. Sydney discussed this, too, with his children and did not agree.

42. In or around 2015, Sydney asked his children to "negotiate" directly with Eisen over her monetary and other demands.

43. Sydney did so because he wanted to reach some sort of reasonable accommodation and to put an end to Eisen's demands and her threats to "throw him out of the house."

44. Sydney's children, particularly Jonathan and Scott, proposed to Eisen a $100,000 payout.

45. Eisen countered with a demand for $120,000.

46. Eisen's $120,000 demand was accepted by all concerned, including Eisen, as the complete and final resolution of the matter.

47. Eisen's monetary demands, bullying, intimidation and threats continued nevertheless.

48. In January 2016, Sydney sent a letter to his children, instructing them that it was his wish to bequeath $120,000 to Eisen and also to permit her to use the New York vacation home for one year after his death.

49. These January 2016 instructions were never formalized by amending Decedent's will or trust agreement.

50. Sydney's medical, cognitive and mental health began to deteriorate sharply starting around 2018. He was diagnosed with bladder cancer, had his bladder removed, and was compelled to urinate through a urostomy bag for the remainder of his life.

51. Sydney found it difficult to maintain the cleanliness of the urostomy bag and attachments. Eisen did not help him, but instead used this as another opportunity to berate him.

52. Sydney also began exhibiting signs of depression and was referred for treatment and therapy.

53. Sydney also experienced kidney failure and, starting around 2019, was required to undergo dialysis three times per week.

54. Being a dialysis patient significantly exacerbated Sydney's depression.

55. Sydney was unable to drive by then. Even though the dialysis center was a short distance from their home, Eisen did not agree to take him. Instead, Sydney was compelled to pay for private medical transport.

56. There were a number of recurring medical issues and crises stemming from dialysis, the urostomy bag, falling, and heart problems, as a result of which Sydney was hospitalized several times for acute care and for rehabilitation.

57. Sydney repeatedly expressed his fear of nursing homes and his fear that Eisen would "throw him out of the house", but continued to live with Eisen despite offers from his children that he could move in with them.

58. At around the same time, Jonathan and Scott learned that, in addition to depression, Sydney was exhibiting a certain amount of fatigue and confusion and was having trouble managing his finances, particularly his taxes.

59. At Sydney's request, Scott began handling Sydney's taxes.

60. Sydney's medical condition continued to deteriorate, and he was hospitalized repeatedly.

61. In January 2020, immediately upon Sydney's discharge from one of his many hospitalizations, Eisen brought Sydney to an attorney of Eisen's own choosing for purposes of amending the Trust Agreement for her sole benefit and in accordance with her demands.

62. Eisen did so behind the backs of Sydney's children.

63. Sydney was by then frail and weak, battered by years of emotional abuse, completely dependent on Eisen for his basic needs, intimidated by her threats to "throw him out of the house," and afraid of dying alone in a nursing home.

64. Sydney was also completely unaware that Eisen was not truly "impoverished" and living on limited income.

65. The purported amendment, procured through fraud, intimidation, existential threats, emotional abuse and duress, provided Eisen with a $420,000 beneficial interest in the Trust, free and clear, ahead of any amounts to be distributed amongst Sydney's children.

66. All discussions and arrangements between Eisen and Sydney relating to the purported amendment were kept confidential — until Scott discovered it about one month later.

67. On information and belief, Eisen did not permit Sydney to speak privately with the attorney she selected, but only in her presence.

68. On information and belief, at all times relevant herein Eisen was and is the settlor and sole beneficiary of the Joyce Eisen Revocable Trust, with well over $1 million in assets.

69. On information and belief, at no time did Eisen make any similar bequest or provision for Sydney in her own estate plans — not in her will, and not in any trust agreement.

70. Scott discovered the purported amendment in February 2020 when he visited Sydney, and was shocked by Eisen's money grab.

71. Subsequently, Sydney expressed to his children that he wanted to change or revoke the purported amendment but could not do so due to his limited mobility, Eisen's constant presence, and out of fear that Eisen would "throw him out on the street."

72. Sydney's children did not press the issue at that time because they were more concerned about his care, comfort and sense of security in his remaining years.

73. Instead, Sydney's children prioritized ensuring his medical compliance, arranging for home health aides, advocating for physical and occupational therapy, purchasing needed medical equipment such as walkers and a wheelchair, and convincing Eisen to permit a home safety assessment due to the risk of falling.

74. Sydney was hospitalized for the final time in July 2022 after the dialysis center identified that he was in medical crisis.

75. At the hospital, the doctors explained that Sydney's esophageal cancer had metastasized and that there was little they could do to help him.

76. Sydney decided to end treatment and enter hospice care.

77. Because hospice care entailed ending dialysis, it was expected that Sydney would pass away in a matter of days.

78. Eisen was informed of the situation and of Sydney's wish to be in home hospice so that he could die at home and not in a hospice facility.

79. On Monday, July 11, 2022, Scott and Sydney's other son, Douglas, discussed the situation with Eisen, who indicated she would only agree to Sydney returning to her home for hospice care if Jonathan agreed she would not need to pay him monies that she owed him.

80. Ironically, that underlying debt arose from Jonathan's legal services rendered to Eisen in connection with a New York lawsuit brought by Eisen against her nephew over a dispute with her sister-in-law concerning her deceased brother's estate.

81. On Tuesday, July 12th, Eisen demanded this monetary concession directly from Jonathan.

82. Caught between his father's wish to die in home hospice and Eisen's exploitation of the situation for her financial benefit, on Wednesday, July 13th, Jonathan informed Eisen that he would agree to her demands.

83. Eisen's monetary demands having been met, Sydney was discharged to home hospice care on Thursday and passed away on Friday, July 15th, surrounded by his children and several grandchildren.

84. Eisen was invited but declined to attend Sydney's funeral, apparently because Sydney was buried in the same cemetery as his wife.

### FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT

85. Plaintiff incorporates by references and realleges the preceding paragraphs as if set forth at length herein.

86. Under Florida law, a trust agreement and/or any amendment thereof is void if it was procured by fraud, duress, mistake, or undue influence.

87. Under Florida law, a presumption of undue influence arises when a trust beneficiary had a confidential relationship with the decedent/settlor and actively procured a benefit for herself.

88. Eisen was Sydney's girlfriend for a number of years and had a confidential relationship with him.

89. Eisen actively procured the purported January 2020 amendment.

90. As described throughout this Complaint, Eisen procured the amendment through a combination of fraud, duress and undue influence over Sydney, including but not limited to:

    a. Actively concealing her own substantial assets from Sydney, on information and belief well in excess of $1 million;

    b. Convincing Sydney, on false pretenses and with the intention that he rely on her misrepresentations, that she was "impoverished" and lived on a limited income;

c. Emotionally abusing, belittling and mocking Sydney over the course of many years, while repeatedly threatening to "throw him out of the house" if he did not give in to her demands;

d. Knowingly exploiting Sydney's fear of living alone and his fear of nursing homes;

e. Working to diminish Sydney's family relationships and disparage his children in order to increase Sydney's dependence on her and her influence over him;

f. Wearing Sydney down with incessant demands for monetary concessions contrary to his true wishes, as a precondition for staying in her good graces;

g. Selecting an attorney of her own choosing to prepare the purported amendment;

h. Escorting Sydney to her chosen attorney immediately upon his discharge from one of his many hospitalizations and in a state of physical and mental weakness;

i. Remaining in the attorney's office with Sydney while the purported amendment was discussed and prepared;

j. Instructing the attorney on the terms of the purported amendment and/or instructing Sydney what to say; and

k. Ensuring her sole, one-way benefit from the purported amendment by not making any corresponding provision for Sydney in her own estate plans.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against Eisen and award the following relief: (a) declaring that the purported January 2020 amendment to the trust agreement is null and void; and (b) such other and further relief that the Court may deem just and proper.

Respectfully submitted,

Date: February **22**, 2023

*/s/ Jonathan Miller*
Jonathan Miller, *pro se*
100 Overlook Center, 2nd Floor
Princeton, N.J. 08540
Tel. (609) 955-1226
Fax (609) 964-1026
Email: jonathan.miller@lawyer.com

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands trial by jury on all issues so triable.

Date: February **22**, 2023

*/s/ Jonathan Miller*
Jonathan Miller, *pro se*

<div style="text-align:center">THE LAW FIRM OF</div>

| | | |
|---|---|---|
| *Jonathan R. Miller, Esq.*<br>*Admitted in NJ, NY & PA*<br>jonathan.miller@lawyer.com | **JONATHAN R. MILLER**<br>*Tel.: 609-955-1226*<br>*Fax: 609-964-1026*<br>*jmillerlawfirm.com* | <u>Main Office:</u><br>*100 Overlook Center, 2nd Floor*<br>*Princeton, N.J. 08540*<br><br><u>New York Office:</u><br>*300 Cadman Plaza West, 12th Floor*<br>*Brooklyn, N.Y. 11201* |

<div style="text-align:center">**\*\*\* Not Admitted To Practice Law In This Court \*\*\***</div>

<div style="text-align:center">February 22, 2023</div>

<u>**VIA OVERNIGHT DELIVERY**</u>
Clerk's Office
U.S. District Court for the Southern District of Florida
Paul G. Rogers Federal Building and U.S. Courthouse
701 Clematis Street, Room 202
West Palm Beach, FL 33401

    Re:    <u>Miller v. Eisen (*new civil matter*)</u>

Dear Sir/Madam:

    I am the *pro se* plaintiff in the above-listed matter. I am enclosing the following documents:

- Complaint
- Civil Cover Sheet
- Summonses
- Payment check

    Please file the Complaint and cover sheet, issue the summonses, and return a file-stamped copy of the Complaint together with the signed summonses to my above-listed New Jersey office.

    I am not admitted to practice law in Florida and am proceeding *pro se*. However, if possible I would request temporary ECF filing authorization for this matter only, which would be a convenience to all of the parties and to the Clerk's Office alike.

    Thank you for your assistance and courtesies.

<div style="text-align:right">Yours truly,<br><br>*/s/ Jonathan R. Miller*<br>Jonathan R. Miller</div>

Enclosure(s)





PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

RDC 07

33401

PRIORITY ★ MAIL ★ EXPRESS™

OUR FASTEST SERVICE IN THE U.S.

28

WHEN USED INTERNATIONALLY, A CUSTOMS DECLARATION LABEL MAY BE REQUIRED.

EMS

EP13F July 2013 OD: 12.5 x 9.5

PS10001000006

UNITED STATES POSTAL SERVICE® | PRIORITY MAIL EXPRESS®

CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE (609) 955 1226

Jonathan R Miller, Esq.
100 Overlook Center, 2nd Fl.
Princeton NJ 08540

DELIVERY OPTIONS (Customer Use Only)

☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
☒ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE ( )

Clerk's Office
U.S. Dist. Court, Southern Dist of Fl.
701 Clematis Street, Room 202
West Palm Beach, FL

ZIP + 4® (U.S. ADDRESSES ONLY) 33401

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

PEEL FROM THIS CORNER

PAYMENT BY ACCOUNT
USPS® Corporate Acct. N

ORIGIN (POSTAL SERVICE USE
☒ 1-Day

PO ZIP Code: 08525

Date Accepted (MM/DD/YY): 2.22.23

Time Accepted: 9:35 ☒ AM ☐ PM

Special Handling/Fragile: $

Weight ☒ Flat Rate lbs. ozs.

DELIVERY (POSTAL SERVICE

Delivery Attempt (MM/DD/YY) Time

Delivery Attempt (MM/DD/YY) Time

LABEL 11-B, MAY 2021

destinations. See DMM ar Label 228, March 2016

+ Money Back Guarantee for U.S. destinations only.

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE